UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

ROBERT COLYER,                      )
                                    )
            Plaintiff,              )
                                    )
      vs.                           )        Case No. 4:22-cv-00193-AGF
                                    )
LEADEC CORP.,                       )
                                    )
            Defendant.              )

## <u>MEMORANDUM AND ORDER</u>

This matter is before the Court on Defendant Leadec Corp.'s ("Leadec") motion (ECF No. 67) for summary judgment with respect to the only remaining claims in this case: Plaintiff Robert Colyer's claims alleging race discrimination and retaliation, brought under Title VII of the Civil Rights Act, 42 U.S.C. § 2000(e) et seq., and 42 U.S.C. § 1981. Leadec has also moved to strike Colyer's exhibits 87 and 88, or portions thereof, incorporated into Colyer's statements of additional material facts (ECF No. 110) and attached to his opposition brief. These exhibits are declarations of two former Leadec employees.[1] For the following reasons, the Court will deny the motion to strike but, as discussed below, will consider only that evidence which is admissible and material. The Court will grant the motion for summary judgment.

---

[1]     Leadec asserts that one of the declarants, Bryant Strong, was a temporary contractor rather than an employee. But the distinction is irrelevant here.

## BACKGROUND

Viewing the evidence and all reasonable inferences in the light most favorable to Colyer for purpose of summary judgment, the record establishes the following.

### Colyer's Employment with Leadec

Colyer, a Black man, was hired by Voith Industrial Services to work in a Class I: Janitor position at the Wentzville General Motors assembly plant on February 21, 2013. The position was subject to a collective bargaining agreement with a union to which Colyer belonged.  Leadec acquired Voith in 2017, and in doing so, it took over the obligations and responsibilities of the collective bargaining agreement.

Leadec thereafter employed Colyer at the Wentzville plant from August 1, 2017 to May 15, 2019.  Colyer worked at various times in janitorial and service attendant positions.  At the relevant time, Lee Pagano, a White man, was General Manager for Leadec's Wentzville and other plants.  Cheryl Hertfelder, a White woman, was hired in 2018 as the Human Resources Manager for the Wentzville plant.  Hertfelder testified that she was hired to "change the culture," including to address whether union leadership was following the collective bargaining agreement's terms.  Colyer was one of five elected union representatives throughout the relevant time, and he represented approximately 150 auto workers at the Wentzville plant.

Although Leadec had an "open door policy," Hertfelder instructed employees to follow the chain of command with respect to reporting grievances.  Hertfelder's supervisor was a Black man named Kevan Glover; at one point, Glover was the only Black member of management at the Wentzville plant.  According to Colyer, Hertfelder

2

told him (Colyer) not to report his grievances to Glover, stating, "When mama talks, you're going to learn you don't run to daddy."  ECF No. 110-1, Pl.'s Ex. 1, Colyer dep. at 143:16-19.  Colyer interpreted that statement to be racist.

**Colyer's Grievances Relating to Race Discrimination**

Colyer submitted several grievances on behalf of the Wentzville plant's bargaining unit employees.  The first of these grievances on record was in September of 2018, and the last was in February of 2019.  These grievances charged Wentzville plant management with violating the collective bargaining agreement's terms with respect to race discrimination and also accused management of creating a hostile work environment based on national origin and of exhibiting race-based bias in its promotion and disciplinary practices.

Leadec's corporate representative, Angela Olson, testified by deposition in this case that the relationship between Leadec and the union had become quite contentious around this time (2018 to 2019), and that the union had a "very abusive grievance process where [union leadership] would file grievance upon grievance upon grievance upon grievance on the same topics" with "no specifics in the grievance," preventing management from "mov[ing] through the process timely."  ECF No. 110-5, Pl.'s Ex. 5, Olson dep. at 86:18-87:14; 91:7-9.

On or around February 23, 2019, a Wentzville plant supervisor informed Colyer that he was being moved from the service attendant duties he had been performing at that time to a janitorial position, which would require him to break down heavy pallets.  Colyer believed that the change to more physically tasking duties was made to retaliate

3

against Colyer for filing "too many grievances."  ECF No. 115, Pl.'s Statement of Facts ¶ 34 (citing Colyer's deposition testimony).

**Leadec's Termination of DeAngelo Presberry's Employment**

In January of 2019, Leadec fired Black lead union representative DeAngelo Presberry over allegations of sexual harassment.  Hertfelder investigated the allegations against Presberry and received information from Leadec employees Amanda Meyer, Lytishia Jones, and Kaitlyn Gildehaus regarding these allegations.  Meyer and Gildehaus are White, and Jones is Black.

Following her investigation, Hertfelder terminated Presberry's employment on January 30, 2019, for sexual harassment. The union grieved Presberry's discharge in February of 2019, and, following a hearing, an arbitrator denied the grievance and upheld Leadec's discharge decision on February 11, 2020.  *See* ECF No. 69-1, Arbitrator's Decision and Award.

**Related Complaints Against and Investigation of Colyer**

In April of 2019, Hertfelder received written complaints from Meyer and Jones alleging that Colyer and another Black union representative, Nick Jackson, had harassed and intimidated them because of their sexual harassment complaints against Presberry. Around the same time, Gildehaus also verbally reported to Hertfelder similar complaints, including that Colyer falsely accused Gildehaus of stealing time in order to intimidate her for reporting Presberry's sexual harassment.

Around this time, Colyer informed Hertfelder that he was aware that his coworkers had complained about him but that "he had not done anything wrong."  ECF

No. 115, Pl.'s Statement of Facts at ¶ 50.  In her deposition in this case, Hertfelder could not recall when Colyer so stated this to her or whether she did any separate investigation of Colyer's denial in this regard.  ECF No. 110-14, Pl.'s Ex. 14, Hertfelder dep. at 125-126.

However, Leadec did retain an outside investigator, Ann Plunkett of Workforce Partners, to investigate the complaints against Colyer.  Leadec decided to hire an outside investigator because Hertfelder was involved in Presberry's termination, and she did not want to create an impression that she was targeting the next in line of union leadership, namely, Colyer and Jackson.  ECF No. 110-5, Pl.'s Ex. 5, Olson dep. at 64:3-14.

Plunkett investigated the complaints by reviewing the collective bargaining agreement, employee handbook, and written statements of witnesses, as well as by interviewing Hertfelder, Jones, Gildehaus, Meyer, Colyer, Jackson, and several others.

One of the complaints that Plunkett investigated was Jones's allegation that, on or about April 17, 2019, a document was posted in the "team center" of the plant stating, "charges filed by Brother DeAngelo Presberry against Sisters Lytishia Jones and Kaitlyn Gildehaus were found to be proper."   ECF No. 68-14, Def.'s Ex. N, Plunket Report at 3.  The posting of this document had the effect of intimidating Jones and Gildehaus, and Jones accused Colyer of posting the document.  *Id.*  Jones also accused Colyer and Jackson of no longer representing her as a member of the union, giving her "points that [were] not appropriate," and taking other actions to intimidate her.  *Id.* at 3-4.

Another complaint that Plunkett investigated was Gildehaus's complaint that Colyer and Jackson tried to take away a lunch break accommodation that she had

5

previously received for childcare purposes, as retaliation for Gildehaus's complaints against Presberry.  *Id.* at 4.

Finally, Plunkett investigated Meyer's complaint against Jackson only (not Colyer), including that Jackson falsely accused Meyer of misconduct in retaliation for her complaints against Presberry.  *Id.* at 6.

After her investigation, Plunkett issued the following findings in a report to Olsen and Leadec dated May 14, 2019:

Investigation Findings

1. Lytishia Jones and Kaitlyn Gildehaus made credible and persuasive statements about being subjected to retaliation, harassment and intimidation by Rob Colyer and Nick Jackson at work.  They are clearly frightened about coming to work and are in fear of personal physical harm.  This conduct is a violation of the company Harassment Policy and the Employee Conduct policy that prohibit retaliation and harassment.

2. Amanda Meyer made credible and persuasive statements about being subjected to retaliation, harassment and intimidation by Nick Jackson.  Ms. Meyer is frightened about coming to work and is fearful of physical harm.  Mr. Jackson's conduct is a violation of the company Harassment Policy and the Employee Conduct Policy [that] both prohibit retaliation and harassment.

3. Nick Jackson reported Amanda Meyer to Justin Hendee in retaliation for her complaints about Mr. Presberry.  Justin Hendee corroborated Ms. Meyer's assertion that Nick Jackson was trying to get her in trouble by reporting her . . . .

4. It was apparent that Rob Colyer posted the union document on the team center bulletin board.  There is no other credible explanation.  The posting of this document about "charges" against Kaitlyn Gildehaus and Lytishia Jones was a clear act of retaliation, harassment and intimidation.  The posting was also intimidating to other employees to see that "charges" were brought against employees who made complaints and "charges" were made against the union president who tried to help them.  Mr. Colyer's conduct was in violation of the company Harassment Policy and the Employee Conduct Policy that prohibit retaliation and harassment.

6

The posting on the company bulletin board, without authorization, was also a violation of Shop Rule number 23 in the Collective Bargaining Agreement.

5. Rob Colyer investigated and accused Kaitlyn Gildehaus of "stealing time" in retaliation for her complaint against Mr. Presberry. Kaitlyn Gildehaus had been allowed to take her lunch period at the end of her shift in order to coordinate care for her child with her husband who works at GM on the second shift. After her complaint against Mr. Presberry, Rob Colyer accused Ms. Gildehaus of "stealing time" by leaving work early, even though she had not taken a lunch period. Mr. Colyer's conduct was in violation of the company Harassment Policy and the Employee Conduct Policy that prohibit retaliation and harassment.

6. Throughout my conversations with employees, it was clear that employees in the plant are genuinely frightened and intimidated by the actions of Mr. Colyer and Mr. Jackson. Employees are also very afraid of Mr. Presberry and are afraid of him returning to work. I was told by many people that employees who are aware of ongoing harassment, intimidation and retaliation of those who made a complaint, are too afraid to speak out. The employees are afraid of retribution by Mr. Colyer and Mr. Jackson.

*Id.* at 14-15.

### Leadec's Termination of Colyer's Employment

Hertfelder terminated Colyer's employment by letter sent on May 15, 2019, one day after Plunkett sent her report to Leadec.[2] In that letter, Hertfelder stated that Leadec decided to terminate Colyer's employment "[a]fter an independent investigation regarding charges of intimidation and harassing behavior of co-workers who were participating in an investigation," and that Colyer "violated major shop rule #2 which reads, 'Assaulting, fighting, threatening, intimidating, coercing or interfering with employees or supervision,' as well as violating Leadec's policy regarding employee

---

[2]     Leadec also terminated Jackson's employment.

conduct prohibiting any form of harassment."  ECF No. 110-17, Pl.'s Ex. 17.  It is

undisputed that, under the collective bargaining agreement effective at the time, violation

of shop rule #2 constituted a "major" violation that could result in discipline "up to and

including discharge."  ECF No. 109-1, Def.'s Statement of Facts at ¶ 12.  Likewise,

Leadec's employee conduct policy at the time provided that "[e]mployees who violate the

standards of conduct will be subject to discipline up to and including termination of

employment."  *Id.* at ¶ 13.

Hertfelder testified by deposition in this case that she terminated Colyer without

ever having received Plunkett's final report, but that she had received a summary of

Plunkett's findings.  Hertfelder testified that she based her termination decision on that

summary of Plunkett's report, as well as her (Hertfelder's) own preliminary investigation

and incidents that she had witnessed.

Leadec thereafter hired ten housekeepers between May 16, 2019 and December

31, 2019.  Six of them were Black, and four were White.

**Colyer's Complaints Against and Allegations Regarding Other Employees**

Colyer alleges that Leadec treated several other employees more favorably than it

treated Colyer.  For example, Colyer alleges that, in October of 2018, during a safety

meeting, Justin Hendee, a White supervisor at the Wentzville plant, aggressively

approached Colyer and stood over Colyer, purportedly to stop Colyer from disrupting the

meeting.  Colyer reported the incident to Hertfelder, who stated that she would

investigate.  Leadec disciplined Hendee for this incident, including coaching him and

imposing a week-long suspension, but Leadec did not terminate Hendee's employment.

Also in 2018, Colyer attended a "town hall meeting" during which a White Leadec human resources official, Carole Franco, referred to Colyer and other union workers as "gangsters."  ECF No. 115, Pl.'s Statement of Facts at ¶ 118.

Next, Colyer alleges that, shortly before his termination, Hertfelder received a report that Jones (one of Colyer's accusers, who is Black) had harassed and used the "N word" against a Black, male employee at the Wentzville plant.[3]  In support of this allegation, Colyer cites Hertfelder's testimony during Presberry's arbitration hearing, in which Hertfelder discussed this incident.  *See* ECF No. 110-27, Pl.'s Ex. 96, Arbitration Hrg. Tr.  According to Hertfelder, Jones admitted to using a racial epithet as "a term of endearment used between black people," and while Hertfelder accepted Jones's explanation that it was a term of endearment, Hertfelder told Jones that she "didn't care for that word whether it was used between white people, black people or anyone else and [she] didn't want to hear it again."  ECF No. 115, Pl.'s Statement of Facts at ¶ 103.  However, Hertfelder did not discipline Jones for this incident.

Hertfelder was also aware that Meyer was overheard using the "N word" when relaying a story to coworkers and, as part of that story, repeating the exact words that another employee had used.[4]  *See* ECF No. 115-2, Def.'s Ex. S.  Following report of this incident, Leadec counseled Meyer "on using different language when relaying a story unless she was told to use exactly the words used."  *Id.*

---

[3]     It is unclear from the record when this incident took place.

[4]     Again, it is unclear when this incident took place.

Colyer also alleges that "Leadec allowed White employees such as Tino Patti to discuss Mr. Presberry without consequence," even though Leadec terminated Colyer for intimidation after he allegedly posted a document mentioning Presberry.  ECF No. 115, Pl.'s Statement of Facts at ¶ 79.  In support of this allegation, Colyer cites to a document entitled "Leadec/MPS Elections," which appears to be a letter addressed to bargaining unit employees and which is signed by "Tino Patti."  ECF No. 110-15, Pl.'s Ex. 15.  The letter is not dated but discusses Presberry's suspension in connection with a discussion about an upcoming election for union chairman.  *Id.*  Neither the letter nor any other evidence in the record discloses Patti's race.

As a final example of Leadec's differential treatment of White and Black employees, Colyer alleges that a White employee named Dan Kroner was given a "second chance" after making sexual comments to a coworker.  ECF No. 115, Pl.'s Statement of Facts at ¶¶ 112-16.[5]

**Thompson and Strong Declarations, and Leadec's Motion to Strike**

As indicated above, Colyer has also submitted in connection with his opposition brief two sworn declarations of former Leadec employees, Sherita Thompson and Bryant Strong (attached to Colyer's opposition brief as Exhibits 87 and 88, respectively).

In her declaration, sworn under penalty of perjury, Thompson states that she was employed in the Wentzville plant's janitorial / service attendant department and worked

---

[5]     The Court notes that these paragraphs cite to portions of Hertfelder's deposition transcript that were not attached to Colyer's opposition brief.  But even accepting these paragraphs as true, they do not alter the Court's analysis, as discussed below.

with Colyer for approximately four years.  Thompson goes on to state, among other things, that: Leadec was a "very hostile place to work"; "White employees received less punishment" than Black employees for the same offenses; "Leadec showed favoritism to [one of Colyer's accusers] Lytishia Jones"; "Lytishia targeted Black men and had a reputation for it," including "going around and telling other employees that [two Black male employees] were sexually harassing her"; "Black employees were fired at an extremely high rate" after Pagano and Franco took over management; "Leadec used Ms. Jones to get Black men fired"; "[i]t was common knowledge that Mr. Franco and Mr. Pagano didn't like the Black Union members"; and Black employees "left because they were afraid Leadec would terminate them."  ECF No. 110-25, Pl.'s Ex. 87.

In his declaration, also sworn penalty of perjury, Strong states that he worked for Leadec as a facility manager at the Wentzville plant in 2018; that he was in management and not a member of the union; and that he is Black.  Strong goes on to state, among other things, that: Pagano joined the Wentzville plant in 2018; sometime early in Pagano's tenure at the plant, Strong overheard a conversation between Pagano and two other White management employees in which Pagano stated, "we're gonna get them," referring explicitly to the "union reps," and Pagano added, "we're gonna get that motherfucker Presberry"; "it was clear to [Strong] that this [statement by Pagano] was not about management vs. union, it was about Black vs. White" because Strong "was high-ranking management, and Mr. Pagano did not make [the above-noted] comment to [Strong]"; union representatives at the Wentzville plant were "overwhelmingly Black"; and Leadec informed Strong his employment was being terminated only a day or two

after the conversation in which Pagano said, "we're gonna get them," despite Strong not having any prior "issues or writeups at Leadec."  ECF No. 110-26, Pl.'s Ex. 88.

Leadec seeks to strike these declarations, in whole or in part, because they lack sufficient information to evidence the employees' personal knowledge to support the statements contained therein; the statements lack proper foundation and are conclusory; and the statements contain inadmissible hearsay.  Colyer opposes the motion, arguing that the declarations are based on the employees' personal knowledge; that Leadec could have deposed the declarants but did not do so; and that the declarations do not contain hearsay because the alleged out-of-court assertions were all statements of a party opponent.

The Court declines to impose "extreme measure" of striking the declarations.  *See Stanbury L. Firm v. I.R.S.*, 221 F.3d 1059, 1063 (8th Cir. 2000) (discussing the standard for a motion to strike).  But the Court will address the declarations and Leadec's challenges thereto below, only to the extent the declarations are relevant to the Court's analysis.  And as discussed below, the Court will disregard those portions of the declarations that are inadmissible or immaterial.  *See State Farm Fire & Cas. Co. v. Air Vents, Inc.*, 577 F. Supp. 3d 941, 959 (N.D. Iowa 2021) ("[T]here is no utility in striking evidence that the Court cannot and did not consider.").

## DISCUSSION

### Summary Judgment Standard

Federal Rule of Civil Procedure 56(a) provides that summary judgment shall be granted "if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "[T]he burden

of demonstrating that there are no genuine issues of material fact rests on the moving

party," and the court must view "the evidence and the inferences which reasonably may

be drawn from the evidence in the light most favorable to the nonmoving party." *Allard*

*v. Baldwin*, 779 F.3d 768, 771 (8th Cir. 2015).

In opposing summary judgment, a plaintiff may not "simply point to allegations"

in the complaint, *Howard v. Columbia Pub. Sch. Dist.*, 363 F.3d 797, 800 (8th Cir. 2004),

or "rest on the hope of discrediting the movant's evidence at trial," *Matter of Citizens*

*Loan and Sav. Co.*, 621 F.2d 911, 913 (8th Cir. 1980).  Rather, the plaintiff "must

identify and provide evidence of specific facts creating a triable controversy." *Howard*,

363 F.3d at 800 (citation omitted).  "Where the record taken as a whole could not lead a

rational trier of fact to find for the nonmoving party, there is no genuine issue for trial."

*Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc).

## Race Discrimination

Colyer asserts that his termination constituted race discrimination under both §

1981 and Title VII.[6]  "The analysis for each of these claims is identical." *Walker v. First*

---

[6]     In opposition to summary judgment, Colyer bases his claims of discrimination and
retaliation solely on his termination, not on his change of job duties in February of 2019.
Other than a single, stray reference to his "demotion" on page 9 of his brief, ECF No. 109
at 9, Colyer nowhere mentions his change of duties as a basis for his claims. *See*
*generally*, ECF No. 109.  Therefore, the Court considers this claim abandoned.  In any
event, Colyer himself describes his change of duties as being motivated by his filing of
"too many grievances," not by his race or by his grievances relating to race
discrimination in particular.  ECF No. 115, Pl.'s Statement of Facts ¶ 34.  Thus, he fails
to show the required causal link between his change of duties and any unlawful race
discrimination or retaliation for protected activity under Title VII or § 1981.  *See, e.g.,*
*Gibson v. Concrete Equip. Co., Inc*., 960 F.3d 1057, 1062, 1065 (8th Cir. 2020)
(describing causation requirements of both discrimination and retaliation claims).

13

*Care Mgmt. Grp., LLC*, 27 F.4th 600, 604 (8th Cir. 2022).  Colyer "can survive summary judgment either by (1) presenting direct evidence of discrimination, or (2) creating the requisite inference of unlawful discrimination through the *McDonnell Douglas*[7] analysis, including sufficient evidence of pretext." *Banford v Bd. of Regents of Univ. of Minn.*, 43 F.4th 896, 899 (8th Cir. 2022) (internal quotations and citation omitted).

### A. Direct Evidence of Discriminatory Intent

"To be considered direct evidence of discrimination, a remark must be by a decisionmaker and show a specific link between a discriminatory bias and the adverse employment action, sufficient to support a finding by a reasonable fact-finder that the bias motivated the action." *Button v. Dakota, Minnesota & E. R.R. Corp.*, 963 F.3d 824, 832 (8th Cir. 2020) (quoting *Torgerson*, 643 F.3d at 1045–46).  The term "direct" evidence "refers to the causal strength of the proof, not whether it is 'circumstantial' evidence." *Torgerson*, 643 F.3d at 1044 (8th Cir. 2011).  Thus, a plaintiff needs "strong (direct) evidence that illegal discrimination motivated the employer's adverse action" in order to avoid the *McDonnell Douglas* analysis and requisite showing of pretext.  *Id.*

Colyer devotes a single, conclusory sentence of his brief to argue that direct evidence of discriminatory intent exists here.  In particular, he states: "The Court has no

---

Further, Colyer has not demonstrated that his change of duties constituted an adverse employment action, also currently required to state a claim of discrimination or retaliation.  *See, e.g.*, *Naes v. City of St. Louis, Missouri*, No. 22-2021, 2023 WL 3991638, at *1 (8th Cir. June 14, 2023) (per curiam) (explaining that under current Eighth Circuit precedent, "an adverse employment action is a tangible change in working conditions that produces a material employment disadvantage").

[7]     *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

14

further to look than Plaintiff's Statement of Facts, replete with Leadec openly flouting the discriminatory motive behind Mr. Colyer's demotion, termination, and its plan to get rid of the Black union representatives."   ECF No. 109 at 9.  He then includes a string citation to several paragraphs of his statement of facts.   *See id.* (citing Pl.'s Statement of Facts at ¶¶ 19, 20, 32-34, 93-109, 119-122).

The purported facts contained in these cited paragraphs are: (1) Strong's declaration stating that he overheard Pagano say, "we're gonna get them," referring to "[t]he union reps"; (2) Strong's belief that it was "clear" this was "about Black vs. White"; (3) Hertfelder's direction that employees follow the chain of command in reporting grievances and her statement to Colyer that "when mama talks, you're gonna have to learn to not run to daddy"; (4) Colyer's own grievances regarding race discrimination by plant supervisors; (5)  Thompson's declaration that "Leadec used Ms. Jones to get Black men fired," that it was "common knowledge that Ms. Franco and Mr. Pagano didn't like the Black Union members," and that "[a] lot of the Black employees . . . left because they were afraid Leadec would terminate them next"; (6) Hertfelder's responses to Jones's and Meyer's alleged use of the "N word"; and (7) Franco's calling Colyer and other union workers "gangsters" during a town hall meeting in 2018.  *See* ECF No. 115, Pl.'s Statement of Facts at ¶¶ 19, 20, 32-34, 93-109, 119-122.

These alleged facts are largely inadmissible or immaterial.  For example, both Strong's conclusion that Pagano's statement was "about Black vs. White" (rather than union vs. management), and Thompson's conclusions that Leadec management did not

15

like Black union members and used Jones to get Black union members fired, are wholly speculative and will not be considered by the Court.

"A declaration used to oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the [declarant] is competent to testify on the matters stated." *Jain v. CVS Pharmacy, Inc.*, 779 F.3d 753, 758 (8th Cir. 2015) (citing Fed. R .Civ. P. 56(c)(4)). "Lay opinion testimony is admissible if the witness has personal knowledge or perceptions based on industry experience." *Jain*,  779 F.3d at 758 (citation omitted).

As Leadec argues in its motion to strike, Strong's and Thompson's declarations fail to meet these requirements.  And while "[i]n some instances, courts will infer personal knowledge from the content" of the statements contained therein, *Brooks v. Tri-Sys., Inc.*, 425 F.3d 1109, 1111–12 (8th Cir. 2005), the content and context of the statements at issue here do not support any inference that they reflected Strong's or Thompson's personal knowledge, as opposed to pure speculation.

Further, these statements and the other facts cited by Colyer are immaterial to the issue of direct evidence.  Even assuming that Pagano's alleged negative statements about union representatives were both admissible and about race (a questionable proposition, at best), there is no evidence that Pagano was involved in the decision to terminate Colyer. *See Elam v. Regions Fin. Corp*., 601 F.3d 873, 878 (8th Cir.2010) ("statements by

nondecisionmakers" are not direct evidence).  The same is true with respect to Franco's alleged statement calling union members "gangsters."[8]

The decisionmaker in this case was Hertfelder, and no reasonable factfinder could conclude on this record that Hertfelder—or, for that matter, Plunkett, who investigated Colyer's alleged misconduct—was motivated by racial bias.  Hertfelder's direction to Colyer to follow the chain of command and "not run to daddy" when reporting grievances does not "reflect, without inference, a discriminatory bias." *Perry v. Zoetis, LLC*, 8 F.4th 677, 682 (8th Cir. 2021).  And her counseling Jones and Meyer not to use the "N word," even as an alleged term of endearment or when relaying a story, was not causally connected—or even remotely related—to the decision to terminate Colyer.

In sum, no reasonable jury could find that Hertfelder's alleged conduct shows a strong causal connection between an intent to discriminate based on race and Colyer's termination.  Therefore, the Court turns to the *McDonnell Douglas* analysis.

### B. *McDonnell Douglas* **Analysis and Pretext**

The *McDonnell Douglas* analysis requires the plaintiff to show: (1) membership in a protected group; (2) he was qualified to perform the job; (3) he suffered an adverse employment action; and (4) circumstances sufficient to permit an inference of discrimination.  *Walker*, 27 F.4th at 604–05.  If the plaintiff makes this prima facie showing, "the burden shifts to the employer to provide a nondiscriminatory reason for the

---

[8]        That neither Pagano's nor Franco's statements implicates the race of union members is a separate problem.  *See Torgerson*, 643 F.3d at 1045 ("Direct evidence does not include statements by decisionmakers that are facially and contextually neutral [as to the protected classification].").

discharge." *Id.* If the employer meets that burden, "the plaintiff must demonstrate the employer's proffered nondiscriminatory reason was pretext for intentional discrimination." *Id*. The plaintiff's "burden to show pretext merges with their ultimate burden of persuasion that they were the victims of intentional discrimination." *Id.*

In light of the fully developed summary judgment record, the Court assumes without deciding that Colyer has presented a prima facie case and turns directly to the question of whether Leadec's nondiscriminatory reason was pretext for discrimination. *E.g., McCullough v. Univ. of Arkansas for Med. Scis.*, 559 F.3d 855, 864 (8th Cir. 2009) (noting that such an approach is appropriate at the summary judgment stage).

According to Leadec, Colyer was terminated because, based on Plunkett's findings and on Hertfelder's own preliminary investigation, Hertfelder believed that Colyer had harassed and intimidated employees in violation of shop rule #2 and the employee conduct policy. Leadec has provided record support for this assertion. Leadec has thus satisfied its burden to provide a legitimate, nondiscriminatory reason for Colyer's termination. *See Nelson v. Lake Elmo Bank*, 75 F.4th 932, 937–38 (8th Cir. 2023) (holding that alleged violation of company policy is a legitimate reason for termination). The only remaining question is whether Colyer has demonstrated Leadec's proffered reason was pretext for race discrimination.

1.  Honest Belief Rule

"[T]he showing of pretext necessary to survive summary judgment requires more than merely discrediting an employer's asserted reasoning for terminating an employee." *Id.* at 938 (citation omitted). The Eighth Circuit has made clear:

> If an employer, in explaining a termination, says it believed that the employee violated company rules, then proof that the employee never violated company rules does not show that the employer's explanation was false. That proof shows only that the employer's belief was mistaken. To prove that the employer's explanation was false, *the employee must show the employer did not truly believe that the employee violated company rules.*

*Cross v. United Parcel Serv., Inc.*, No. 21-3819, 2023 WL 3858611, at *1–2 (8th Cir. June 7, 2023) (quoting *Pulczinski,* 691 F.3d at 1003) (emphasis in original). Further, the plaintiff "must show that the circumstances permit a reasonable inference to be drawn that the real reason [the employer] terminated [him] was because of [his race]." *Nelson*, 75 F.4th at 938.

Colyer argues that this so-called "honest belief rule" is inapplicable here, relying primarily on the Eighth Circuit's decision in *Gilooly v. Mo. Dept. of Health and Senior Servs.*, 421 F.3d 734 (8th Cir. 2005). Colyer's reliance on *Gilooly* misses the mark.[9]

In *Gilooly*, an employer fired its employee for making false statements when accusing his coworkers of sexual harassment. 421 F.3d at 727. Noting that the sexual harassment complaint itself was protected under Title VII, the Eighth Circuit ruled that material questions of fact existed as to whether this firing was unlawful retaliation. *Id.* at 740. The Eighth Circuit held that "the reasons for firing must be sufficiently independent from the filing of the [Title VII protected] complaint to constitute legitimate and nonretaliatory reasons for discharge." *Id.* Otherwise, it reasoned, "any employee who

---

[9]     The relevant holding of *Gilooly* applies to retaliation claims, not discrimination claims. But because Colyer relies on the case to save both his discrimination and retaliation claims, the Court will address *Gilooly* as it relates to both sets of claims.

files a Title VII claim and is disbelieved by his or her employer [could] be legitimately

fired," which would deter employees from filing discrimination complaints and would

defeat the purposes of Title VII. *Id.*

Thus, the holding of *Gilooly* was "narrow" and limited to circumstances when "an

employer's discipline was based solely on its disbelief of an employee's [Title VII

protected] harassment complaint, without any independent corroboration." *Alvarez v.*

*Des Moines Bolt Supply, Inc.*, 626 F.3d 410, 418 (8th Cir. 2010) (citing *Gilooly*, 421 F.3d

at 740–41 and *Richey v. City of Indep.*, 540 F.3d 779, 784–85 (8th Cir. 2008)).  Here,

Colyer was terminated after Leadec concluded, based on Plunkett's investigation, that he

harassed and intimidated employees, not that he filed a false grievance or other Title VII-

protected complaint.  *Gilooly* simply does not apply.  *See Alvarez*, 626 F.3d at 418

(holding that *Gilooly* did not apply where an employee was disciplined for committing

misconduct of a sexual nature, not for filing a false Title VII-protected complaint).  The

Court thus turns to Colyer's other grounds for demonstrating pretext.

　　　2.  Investigation

Colyer argues that he can show pretext by demonstrating that Plunkett's

investigation was a sham and unsupported by facts.  Specifically, Colyer argues that

Plunkett and Hertfelder relied too heavily on subjective criteria rather than objective facts

to judge the credibility of Colyer and his accusers.  However, as noted above, "while a

plaintiff may establish pretext by showing that the employer did not truly believe the

employee engaged in the conduct justifying termination, a plaintiff may not establish

pretext simply by showing that the employer's 'honest' belief was erroneous, unwise, or

even unfair." *Main v. Ozark Health*, 959 F.3d 319, 325 (8th Cir. 2020).  "This is true regardless of whether the employer's explanation is based on first-hand knowledge or third-party reports."  *Id.*

The undisputed evidence shows that Plunkett's and Hertfelder's investigations were supported by extensive witness interviews and document review.  Even if Colyer could point to specific inconsistencies or holes in these investigations, he has not shown the investigation was a sham, nor shown such significant discrepancies to convince a jury that the Leadec's explanation was pretext for race discrimination.  *See Nelson*, 75 F.4th at 941 (holding that inconsistencies in accounts of whether an employee committed misconduct were insufficient to demonstrate pretext for discrimination).

3.  Similarly Situated Employees

Colyer also argues that he can show pretext by showing that Leadec treated him differently than similarly situated White employees.  "A similarly situated coworker is someone who 'dealt with the same supervisor, [was] subject to the same standards, and engaged in the same conduct without any mitigating or distinguishing circumstances.'" *Cross*, 2023 WL 3858611, at *2 (citation omitted). "At the pretext stage, the test for whether someone is similarly situated is rigorous."  *Id.*

Colyer points to Leadec's alleged failure to investigate his accuser, Jones (who is Black), for her sexual harassment of Black male employees; failure to investigate Jones and Meyer (who is White) for using the "N word"; failure to terminate Hendee (who is White) for allegedly approaching Colyer in an aggressive manner during a safety meeting; failure to fire Dan Kroner (who is White), who was allegedly given a "second

21

chance" after making sexual comments to a coworker; and tolerance of Toni Patti's (race unknown) discussion of Presberry in his letter about the union election.

Colyer has not shown that any of these employees are proper comparators. Jones shares Colyer's race and therefore cannot be a comparator for the purpose of a race discrimination claim; likewise, there is no evidence that Patti is of a different race than Colyer. *E.g.*, *Fair v. Norris*, 480 F.3d 865, 871 (8th Cir. 2007) (similarly situated employee must be of "different race" for a race discrimination claim). In any event, neither Jones, Patti, nor any of the other employees mentioned by Colyer is alleged to have engaged in remotely comparable conduct. Further, Colyer has failed to show that Patti, Hendee, or Kroner were in similar job positions or reported to the same supervisor. *See Nelson*, 75 F.4th at 940 (holding that coworkers were not proper comparators when they engaged in different conduct and reported to a different supervisor).

Finally, Colyer has failed to show pretext in other recognized ways because he has not shown that Leadec failed to follow its own policies or shifted its explanation of its termination decision. *See id.* at 938 (discussing the most common ways to demonstrate pretext). In sum, no reasonable jury could conclude on this record that Leadec's proffered explanation for Colyer's termination was pretext for race discrimination. The Court will thus grant Leadec's motion for summary judgment on Colyer's race discrimination claims under Title VII and § 1981.

**<u>Retaliation</u>**

As with his discrimination claims, Colyer's retaliation claims under Title VII and under § 1981 are subject to the same or substantially similar standards. *See Warren v.*

22

*Kemp*, 79 F.4th 967, 973 (8th Cir. 2023) (discussing standards for both).  "[A]n employee engages in a protected activity under § 1981 when the employee has opposed any practice made unlawful by Title VII involving race-based discrimination."  *Id.*  And as relevant here, under Title VII, "protected activity" includes opposition to practices that discriminate with respect to "compensation, terms, conditions, or privileges of employment, because of [an] individual's race . . . ."  *Id.* (quoting § 2000e-2(a)(1)).

### A. <u>Direct Evidence</u>

Direct evidence with respect to a retaliation claim is "evidence that demonstrates a specific link between a materially adverse action and the protected conduct, sufficient to support a finding by a reasonable fact finder that the harmful adverse action was in retaliation for the protected conduct."  *Sellars v. CRST Expedited, Inc.*, 13 F.4th 681, 693 (8th Cir. 2021), *cert. denied,* 142 S. Ct. 1361 (2022).  Again, "'[d]irect' refers to the causal strength of the proof, not whether it is circumstantial evidence," "[d]irect evidence must relate to people with decision-making authority," and direct evidence "does not include stray remarks in the workplace or statements by nondecisionmakers."  *Id.* (cleaned up and citations omitted).

Colyer combines his discussion of direct evidence supporting both his race discrimination and retaliation claims, devoting to both only the above-noted conclusory sentence that "Leadec openly flout[ed] [its] discriminatory motive," with the same string citation to various paragraphs of his statement of facts.  *See* ECF No. 109 at 9.  Of the paragraphs cited and discussed above, the only one that comes close to referencing protected conduct under Title VII is Strong's declaration that he overheard Pagano say,

"we're gonna get them," referring to "[t]he union reps."  *See* ECF No. 115, Pl.'s Statement of Facts at ¶ 19.  But as noted above, even if this statement were admissible, there is no evidence that Pagano made the statement because Colyer grieved race-based discrimination in particular, which is the only type of grievance at issue that is possibly protected by Title VII.  Nor is there evidence that Pagano was involved in the decision to terminate Colyer.

Again, Hertfelder was the decisionmaker.  And Colyer has not presented evidence of Hertfelder's (or investigator Plunkett's) retaliatory bias sufficient to constitute direct evidence that his termination was in retaliation for his filing of race-based grievances.[10] Therefore, the Court again turns to the *McDonnell Douglas* analysis and specifically to the question of pretext.

### B. Prima Facie Case and Pretext

Again, the Court will assume without deciding that Colyer has demonstrated a prima facie case and will skip to the question of whether Colyer can demonstrate that Leadec's proffered legitimate reasons for his termination were pretext for retaliation.

#### 1. Honest Belief Rule

The honest belief rule referenced above applies equally to Colyer's retaliation claims, and *Gilooly*'s narrow exception to that rule is equally inapplicable to the

---

[10]     Hertfelder's testimony that she was hired to "change the culture" with respect to union leadership's adherence to the collective bargaining agreement, as well as her alleged instruction that Colyer not "run to daddy" with respect to following the chain of command, do not alter this conclusion.  These statements do not single out race-based grievances or otherwise demonstrate a specific link between Colyer's termination and any conduct protected under Title VII.

retaliation claims.  Again, *Gilooly* merely confirmed that "the reasons for firing must be sufficiently independent from the filing of the [Title VII protected] complaint to constitute legitimate and nonretaliatory reasons for discharge."  *Gilooly*, 421 F.3d at 740. The only protected complaints Colyer claims to have filed are his grievances on behalf of other employees complaining of race discrimination.  As discussed above, Leadec nowhere asserted that Colyer's grievances on behalf of other employees were untrue. Because Leadec's stated reasons for terminating Colyer were unrelated to his filing of those grievances, *Gilooly* does not apply.  Thus, Coyler can only survive summary judgment if he demonstrates that Leadec did not honestly believe that Colyer engaged in misconduct *and* that the real reason that Leadec terminated Colyer was to retaliate against him for filing race-based grievances.  Colyer cannot make this showing.

    2.  <u>Timing</u>

Colyer attempts to show pretext by highlighting the temporal proximity between his race-based grievances and his termination.  The record before the Court reveals that the last race-based grievance that Colyer filed was in February of 2019, approximately three months before his termination on May 15, 2019.  "Generally, . . . more than a temporal connection between protected activity and an adverse employment action is required to show a genuine factual issue on retaliation exists."  *Buettner v. Arch Coal Sales Co.*, 216 F.3d 707, 716 (8th Cir. 2000).  Further, temporal proximity "must be very close," and the Eighth Circuit has found that "[m]ore than two months is too long to support a finding of causation without something more."  *Sisk v. Picture People, Inc.*, 669 F.3d 896, 900–01 (8th Cir. 2012).  Particularly in light of the intervening investigation

into complaints that Colyer engaged in intimidation, the timing between his race-based grievances and termination does not evidence an intent to retaliate here.

### 3. Investigation

Next, Colyer again points to deficiencies in Plunkett's investigation as evidence of pretext for unlawful retaliation. But "[t]he record in support of [Leadec's] conclusion is not so sparse, or [its] conclusion so implausible, that [Colyer's] challenge to the *merits* of the decision can create a genuine issue about whether [Leadec's] *motivation* was impermissible." *McCullough*, 559 F.3d at 862 (emphasis in original). Plunkett supported her credibility findings with detailed explanations of her witness interviews, and although Colyer may disagree with her conclusions, no reasonable jury could find that Plunkett or Hertfelder did not honestly believe that Colyer violated the relevant intimidation and harassment policies. More importantly, the record is devoid of evidence that any decisionmaker here was motivated by intent to retaliate against Colyer for Colyer's race-based grievances. This Court has no "authority to sit as a super-personnel department reviewing the wisdom or fairness of the business judgments made by employers, except to the extent that those judgments involve intentional [retaliation]." *Said v. Mayo Clinic*, 44 F.4th 1142, 1149 (8th Cir. 2022).

Colyer has also failed to show pretext in other recognized ways, such as showing that similarly situated coworkers who did not engage in the protected activity were treated more leniently, or that Leadec failed to follow its own policies or shifted its explanation of its decision. Therefore, the Court will grant Leadec's motion for summary judgment on Colyer's retaliation claims under Title VII and § 1981.

## CONCLUSION

Accordingly,

**IT IS HEREBY ORDERED** that Defendant's motion to strike is **DENIED**.  ECF No. 113.

**IT IS FURTHER ORDERED** that Defendant's motion for summary judgment is **GRANTED**.  ECF No. 67.

All claims against all parties having been resolved, a separate Judgment will accompany this Memorandum and Order.

AUDREY G. FLEISSIG
UNITED STATES DISTRICT JUDGE

Dated this 8th day of January, 2024.